Crawford K. Stillwagon v. Commissioner. Octavia Stillwagon v. Commissioner.
Crawford v. Commissioner
Docket Nos. 18243, 18244.
United States Tax Court
1949 Tax Ct. Memo LEXIS 128; 8 T.C.M. (CCH) 644; T.C.M. (RIA) 49174; July 6, 1949
*128 Glenn Y. Davidson, C.P.A., 2503 Gulf Bldg., Houston, Tex., for the petitioners. F. S. Gettle, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: In these consolidated proceedings, the Commissioner determined deficiencies in income tax for the calendar year 1944 as follows: Docket No.
Petitioner
Deficiency
18243
Crawford K. Stillwagon
$15,991.83
18244
Octavia Stillwagon
15,991.83
The sole issue for decision is whether the Commissioner erred in holding that a corporation distributed among its assets in liquidation good will of the value of $70,000, thereby increasing the reported gain of petitioners, who were its only stockholders, upon the disposition of their shares through cancellation. Findings of Fact The stipulation of facts is incorporated herein by this reference, and from it and the oral testimony and exhibits we find that: Petitioners Crawford K. Stillwagon and Octavia Stillwagon are husband and wife, residents of Houston, Texas, and each filed a separate income tax return for the calendar year 1944 on a community property basis with the collector of internal revenue for the first district of Texas. When petitioner in the singular is used herein, *129 it refers to petitioner Crawford K. Stillwagon. On July 14, 1944, petitioners owned 5,313 shares of stock in Well Equipment Mfg. Corporation, hereinafter called the corporation, and on that date they acquired by purchase, at an agreed price of $20 per share, 4,687 shares, being the remaining outstanding stock of the corporation, from the six individuals then owning same, viz: No. of
Name
Residence
Shares
Jesse McKee
Fort Worth, Texas
1,500
Ed Taubert
Fort Worth, Texas
1,500
Glenn Y. Davidson
Houston, Texas
800
S. H. Smith
Houston, Texas
453
H. J. Hagn
Houston, Texas
359
J. H. Robinson
Houston, Texas
75
Total
4,687
The cost to petitioners of the stock of the corporation as of July 14, 1944, after the above purchases, was as follows: 4,737 shares (held less than six
months)
$94,490.00
5,263 shares (held more than six
months)
54,120.00
On July 15, 1944, the corporation was liquidated, at which time its assets, subject to its liabilities, were transferred to petitioners, then its sole stockholders, in cancellation of their stock. The total authorized capital stock of the corporation at the date of liquidation was 10,000 shares of the par value of $10 each, all of which were then issued and outstanding. The book value *130 of the stock of the corporation at the date of liquidation, as shown by its balance sheet, was $191,762.95, or $19.18 per share. Subsequent adjustments to taxable income by examining agents of the bureau of internal revenue increased the net worth of the corporation at date of dissolution to $198,834.35, as reflected by the Commissioner's notice of deficiency, dated February 2, 1948. Neither of these valuations contained an itemization or any allowance for good will. The corporation was organized October 20, 1937. It was engaged in the manufacture and sale of oil field supplies, its principal manufactured product being a coupler or pipe union devised and improved by petitioner. It also sold products of five other companies, about 50 per cent of its sales being products of the other companies. The figures below relate to the corporation and were stipulated: Net Tangible
Net Income
Assets
After Deducting
Year
of December 31
Income Tax
Dividends Paid
1937
$ 69,025.92
[1] *131 $40,262.75
[2] $ 3,224.20
1938
99,058.56
23,398.09
[3] 26,948.65
1939
116,125.37
23,116.53
4,854.50
1940
135,000.35
21,858.44
4,976.50
1941
162,974.98
29,740.78
4,988.25
1942
164,180.62
1,974.47
1943
183,924.13
28,199.46
4,957.50
1944 (1/1 to 7/15)
7,262.70
SALARIES PAID OFFICERS AND STOCKHOLDERS C.K.
H.J.
S.H.
Total
Stillwagon
Hagn
Smith
Other
1937 (Oct. 20 to Dec. 31)
$ 2,155.63
$ 1,325.63
$ 480.00
$ 350.00
1938
14,861.68
9,251.68
$2,560.00
2,900.00
150.00
1939
17,133.17
10,793.17
3,275.00
3,065.00
1940
21,733.40
14,213.40
3,775.00
3,745.00
1941
25,163.53
16,338.53
4,412.50
4,412.50
1942
22,584.54
12,784.54
4,900.00
4,900.00
1943
25,610.63
14,589.78
5,100.00
5,100.00
820.85
1944 (Jan. 1 to July 15)
14,863.91
8,711.51
3,000.00
1,002.40
2,150.00 Petitioners at all times had a controlling interest in the corporation and its predecessors. [4] *132 Petitioner was its president, general manager, active in its operation, and directed its policies. His training and experience well qualified him for the business. He began working in the oil field with cable tool rigs in 1915, and knew all phases of the oil well industry, having spent his life therein. Prior to organizing his own company in 1934, petitioner had worked for several large oil companies in different capacities in Kansas, west and south Texas, and he had personal skill, knowledge and practical experience in the use, sale and manufacture of oil field equipment which enabled him to design and perfect equipment produced by the corporation, the merit and successful manufacture and sale of which was attributable to him. Petitioner "individually run the business and it was a one man company." Petitioner had a wide acquaintance, having served as president of the Texas Manufacturers Association, and was well and favorably known to those engaged in the oil industry in Texas and elsewhere, and many knew the corporation by his name rather than its corporate name. *133 His personal contacts and intimate familiarily with the trade, together with his experience, ability and integrity, was largely responsible for the volume of sales made by the corporation, its profits and financial success. Its largest customer was an oil company of Duncan, Oklahoma, which account he alone controlled, and other leading customers were his acquaintances. Credit for the corporation from the bank with which it did business was obtained upon petitioner's personal endorsement which was required by the bank, saying that they looked to him rather than the corporation. The heads of the five companies whose products the corporation sold were friends of petitioner, and contracts with them were personally secured by him. Beginning in 1943 and continuing until the liquidation in 1944, bona fide efforts were made by petitioners and the other stockholders to sell all of the stock of the corporation to some outside party for $200,000, or $20 a share, but were unable to find a buyer at that price. Among prospective buyers contacted were four different oil companies engaged in a business similar to that of the corporation, to whom complete financial data was given and all of whom investigated *134 and considered the offer of sale, (one of the companies sending a representative from New York to Houston for that purpose) but after due consideration each declined to buy, primarily on the ground that the price was too high. Whereupon petitioners bought the stock of the minority stockholders at the same price they had offered theirs, which sale was freely and fairly made. The fair market value of the stock then, and the next day when the corporation was liquidated, was not in excess of $20 a share. The substance of the evidence relating to the subsequent conduct of the business after the corporation's liquidation appears in footnote [5] *135 below. Petitioners, in their income tax returns, in computing the net capital gain on the assets received by them as a liquidating dividend of the corporation, reported the total value of such assets to be $200,000. The Commissioner determined that the net value of the corporation's tangible assets at the time of liquidation was $198,834.35, to which should be added a good will value of $70,000, making the total value of the assets distributed in liquidation $268,834.35. At the time of liquidation the net value of the corporation's tangible assets was $198,834.35, and the value of its good will was $1,165.65, making *136 $200,000 the total value of the assets distributed in liquidation and received by the petitioners. Opinion The Commissioner determined that for the purpose of computing the capital gain on the assets received by the petitioners as a liquidating dividend from the Well Equipment Manufacturing Corporation, as of July 15, 1944, a good will of a value of $70,000 should be included in addition to $198,834.35, the net value as found by him of the other assets distributed. The total value of the assets distributed in liquidation was determined by the Commissioner to be $268,834.35, while petitioners in their income tax returns reported same to be $200,000, and for which amounts they here contend. The $70,000 good will was based upon a computation by respondent according to the capitalization of earnings method and in his brief he explains how this figure was reached. [6] This method has been approved. ; . However, there is no single measure of value which may be applied directly and uniformly in the determination of the existence or value of good will. There is no strait-jacket. Every case must necessarily be considered in the light *137 of its own facts and the situation must be considered as a whole. See Mertens Law of Federal Income Taxation, section 59.36, Vol. 10, p. 522 and cases cited. The issue here is factual. At the time of its liquidation did the corporation have an asset of good will, and if so, of what value? While earning capacity has been used as a yardstick in valuation of good will, it does not in itself prove either the existence of good will or its value. The earnings of a corporation above a fair return on the investment of its stockholders may be attributable to other factors than good will, as was pointed out in ; ; *138 . It was held in these and other cases that where the success of a corporate business was dependent solely on the personal skill, ability and other characteristics of an individual who controlled and operated it, no value attributable to good will attached to the assets of the corporation. In the instant case the corporation was aptly described as "a one man company" and it was better known by some as "Stillwagon's Company" rather than by its corporate name. Petitioner was its founder and operator; its success in the design, manufacture and sale of its own products and the sale of those of other companies, and all profits derived therefrom were largely, if not entirely, attributable to the ability, skill, experience, wide acquaintance and other personal characteristics of petitioner. His "vast acquaintance and experience in the oil industry" as expressed by one witness we have found contributed to the securing of customers and volume of sales made. The selling agency contracts from other companies were secured by petitioner's personal relations and contacts; the funds from the bank for carrying on the corporation were secured alone upon his personal credit. *139 From this and other evidence we think the success of the corporation was largely attributable to petitioner, and hence, if the corporation had an intangible asset of good will when liquidated, it was of small value. Respondent insists that the purchase in August 1946 (two years after the liquidation) of "substantially the same net assets" by the Chicksan Corp. at a price of $96,000 in excess of the book value of the net tangible assets shows that the assets of the corporation had a good will value, and that the purchaser so recognized. The record does not show that the business in August 1946 had "substantially the same net assets" as in July 1944 when liquidation occurred. As to the assets of July 1944 we know their total value, the items comprising same and the value of each, but as to those of August 1946 we have no itemization and know only their total value. We do know that in October 1946 the net tangible assets of the business had a book value about $75,000 larger than in July 1944. We also know that after liquidation the business was operated as an individual proprietorship until October 1945 when a new corporation was formed with a capital of 20,000 shares, par value $10 each, *140 of which petitioners owned 18,300 shares and employees the remaining 1,700 shares. We also know that after liquidation the net profits of the business materially increased. We also know as a matter of common knowledge that the market values of stocks and commodities substantially increased from 1944 to 1946, and these increases in values were doubtless reflected in the values of the assets and the selling price of the business. In view of these changed conditions, we do not think the selling price of the business in 1946 corroborates respondent's contention of good will value in 1944. In one respect the sale to Chicksan rather tends to corroborate petitioners' contention that it was petitioner's ability and personality, rather than the good will of the business, which prompted the sale and determined its value. As part of the consideration Chicksan required that petitioner: (a) would remain in the employ of the company for at least one year at a salary of $1,000 per month; (b) that he would use his best endeavors to retain the selling agency contracts; and (c) that he would not engage in the same business or compete with it, directly or indirectly, for two years. It is significant *141 that with the petitioner contracting to do these things, sale of the business was effected at a price greatly in excess of its book value, while some two years before, without such agreement, the stockholders were unable to sell the business at its book value, or for a sum slightly in excess thereof. Petitioners earnestly contend that the total value of the assets of the corporation, including good will, when liquidated, was clearly shown to be $200,000, and no more, by the purchase of 46.87 per cent of its capital stock from the minority stockholders the day before at $20 per share. [7] Respondent says this price was not representative of the actual value of the stock, since petitioner directed the corporation's policies, its dividends were small, and that the minority stockholders' "position was such that they would be compelled to accept any price which Mr. Stillwagon might offer to them for their stock." This argument would be more convincing were it not for the fact that the majority and the minority stockholders had all agreed to sell the entire stock of the corporation for $200,000, and efforts had been made by them for more than a year prior to liquidation to sell same at that *142 price, which they were unable to do. That petitioners offered and tried unsuccessfully to sell their stock at the same price they paid the minority stockholders refutes the suggestion of coercion, and the evidence affirmatively shows the sale by the minority stockholders was fairly made and was mutually agreeable. That both the majority and minority stockholders were willing to sell the business for $200,000, and the various prospective buyers thought the price too high and refused to buy, is most persuasive that at time of liquidation the total market value of the business, including good will, did not exceed that sum, and we so hold. Decision will be entered for petitioners. Footnotes
1. Includes corporation income 10/20 to 12/31/37 plus prior 1937 income of predecessor. 2. For period Oct. 20 to Dec. 31, 1937. ↩
3. Dividend paid on account of undistributed profits tax, all of which was returned to corporation on payment of subscribed stock.↩
4. Its Predecessors: (1) Well Equipment Corporation, organized January 21, 1934, with authorized capital of $1,000 and dissolved May 18, 1935. (2) Well Equipment Company, Inc., organized May 18, 1935, with authorized capital of $15,000 par value preferred stock and $100,000 par value common stock. It acquired assets and assumed liabilities of its predecessor and was dissolved October 11, 1937. (3) Partnership called Well Equipment Company then operated the business until October 20, 1937, when the corporation in question was organized.
5. After Liquidation. (1) The business was carried on as an individual proprietorship until 10/27/45. Net profit during this period, before income tax, was 7/15/44 to 12/31/44, $69,095.98; 1/1/45 to 10/27/45, $127,227.46. (2) On 10/27/45 business was incorporated under name of "Well Equipment Mfg. Corp." with total authorized capital stock of 20,000 shares, par value $10 each, of which petitioners acquired 18,300 shares, the balance subscribed by employees. (3) On 8/13/46 petitioners sold their 18,300 shares to Chicksan Corp. of Los Angeles for $336,550, or $18.50 per share. Sales price of entire 20,000 shares was $370,000, Net tangible assets on 10/31/46 had book value of $273,757.30. As part of the consideration of the sale to Chicksan, it required petitioner to agree that: (a) He would use his best efforts to retain the selling agency contracts then held by the company. (b) He would remain in the employ of the company for one year at a salary of $1,000 per month. (c) He would refrain for two years from competing, directly or indirectly, with the company in the manufacture or sale of any articles produced or sold by it.
6. The average tangible assets for the 5-year period, 12/31/38 to 12/31/42, is $135,467.97, and 8% return on the average tangible assets amounts to $10,837.44. The average net income after Federal income taxes for the 5-year period, 12/31/39 to 12/31/43, is $20,977.94. The excess, $10,140.50 of the average net income over an 8% return on the tangible assets capitalized at 15% equals $67,000 which, with the other factors of the successful going concern, supports a good will value of at least $70,000, the amount determined by the Commissioner.↩
7. At $20 per share the total value of the stock was $200,000.↩